John Massouh, SBN 24026866
John.massouh@sprouselaw.com
SPROUSE SHRADER SMITH PLLC
701 S. Taylor, Suite 500
P.O. Box 15008
Amarillo, Texas 79105-5008
(806) 468-3300; (806) 373-3454 FAX

*ATTORNEYS FOR CGB AGRIFINANCIAL SERVICES, INC.*

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ANTHONY CHARLES TORDIGLIONE, | § | NO. 25-44309-elm13 |
| | § | |
| Debtors | § | |

**OBJECTION OF CGB AGRIFINANCIAL SERVICES, INC. TO CONFIRMATION OF DEBTOR'S SUBCHAPTER V PLAN OF REORGANIZATION [Dkt. 92]**

CGB Agrifinancial Services, Inc. ("CGB"), a secured creditor and party in interest in the above-captioned case, hereby files this Objection to Confirmation of Debtor's Subchapter V Plan of Reorganization (Dkt. 92, filed July 8, 2026) (the "Plan"), and respectfully states as follows:

**I. INTRODUCTION**

1. CGB is a secured creditor with a claim in excess of $1,700,000, which claim is secured by liens on real property located in Erath County, Texas (the "Hico Property"). CGB's secured claim arises from two promissory notes—a $600,000 revolving line of credit (Loan No. 21701605) and an $800,000 term loan (Loan No. 21701606)—both dated August 8, 2017, originally payable to ZB, N.A. dba Zions First National Bank, and subsequently assigned to U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation

OBJECTION OF CGB AGRIFINANCIAL SERVICES, INC. — Page 1

programs, serviced by CGB via a power of attorney. Both notes are secured by Deeds of Trust recorded in Erath County, Texas, encumbering identical real property, and both contain reciprocal cross-default provisions.

2. CGB objects to confirmation of the Plan pursuant to 11 U.S.C. §§ 1129 and 1191. As set forth more fully below, the Plan fails to satisfy the requirements for confirmation because it (a) improperly releases CGB's term-loan lien without compensation; (b) fails to define the cramdown terms for the retained mortgage/term-loan component; (c) fails to provide post-petition interest, default-rate interest, and fees to which CGB is entitled as an oversecured creditor; (d) provides no adequate protection during the extended marketing and sale period; (e) fails the feasibility requirement; and (f) creates classification and chain-of-title ambiguities that preclude lawful treatment of CGB's claim.

## II. PROCEDURAL BACKGROUND

3. Anthony Charles Tordiglione (the "Debtor") filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code, which was later converted to a Chapter 11 case, designated as a case under Subchapter V of Chapter 11.

4. On July 8, 2026, the Debtor filed his Subchapter V Plan of Reorganization (Dkt. 92) (the "Plan"), which is the subject of this Objection.

## III. FACTUAL BACKGROUND

**A.** **THE UNDERLYING LOAN DOCUMENTS AND CROSS-COLLATERALIZATION STRUCTURE**

5. CGB's secured claim arises from two promissory notes and corresponding deeds of trust:

(a)     Promissory Note, Loan No. 21701605, in the original principal amount of $600,000, dated August 8, 2017, from Anthony Charles Tordiglione and Cynthia Ann Tordiglione ("Note-1"). Note-1 provides for a Post Maturity Rate equal to the lesser of the maximum legal rate or the contract rate plus 5.000 percentage points, and for late charges and attorneys' fees upon default. Note-1 is secured by a Deed of Trust covering the Hico Property. Pursuant to assignments from Zions and a power of attorney, CBG is proper party with authority to enforce Note-1. As of August 1, 2026, the outstanding balance owed on Note-1 totals $903,298.72, which encompasses principal, accrued interest, and fees.

(b)     Promissory Note, Loan No. 21701606, in the original principal amount of $800,000, dated August 8, 2017, from Anthony Charles Tordiglione and Cynthia Ann Tordiglione ("Note-2"). Note-2 provides for an identical Post Maturity Rate (contract rate plus 5.000 percentage points) and attorneys' fees upon default. The note is secured by a Deed of Trust recorded in Erath County, Texas covering the Hico Property. As of August 1, 2026, the outstanding balance owed on Note-2 totals $878,402.24, which encompasses principal, accrued interest, and fees.

6.     Both notes contain express reciprocal cross-default provisions: a default under either instrument constitutes a default under the other, entitling the holder to accelerate both obligations. Assignments of Mortgage/Deed of Trust were recorded in Erath County, Texas on August 21, 2017 (Document Nos. 2017-04459 and 2017-04462). Critically, the Exhibit A legal descriptions attached to both Assignments are identical—describing the Hico Property, that being Tract One (395.40 acres, J.W. Crawford Survey A-147, less and except 80.970 acres), Tract Two (238.319 acres, Henry Wood Survey Abstract No. 828), and Tract Three (8.08 acres, J.W.

Crawford Survey A-147)—confirming that both Note-1 and Note-2 are secured by the same collateral pool.

### B. THE PLAN'S STRUCTURE

7. The Plan is structured as a partial asset-liquidation/cure plan. It does not rely on the Debtor's operating income to fund creditor distributions—indeed, the Debtor's Schedule I/J reflects negative monthly net income of ($945.12) (monthly income of $8,809.80 against monthly expenses of $9,754.92). Instead, the Plan proposes to fund creditor distributions exclusively through the sale of CGB's collateral.

8. The Debtor's primary asset is the Hico Property, located at 8216 County Road 539, Hico, Texas 76457, consisting of approximately 560 acres, scheduled at a value of $10,000,000. The HICO Property secures the debt owed to CGB on both Note-1 and Note-2. The Plan proposes to initially market and sell up to approximately 100 acres of the Hico Property at an estimated price of $15,000 per acre, yielding estimated gross proceeds of $1,500,000.  No purchase contract exists for this proposed sale. Its pure speculation at this point.

9. The Plan establishes the following sale milestones: broker applications within 30 days of the Effective Date; a listing report within 60 days; an executed purchase contract or status report within 180 days; and a closing or Court-approved revised process within 240 days. Meaning, *IF* this sale goes through as proposed, there would be no funds available for over 8 months (most likely significantly longer depending on the determination of the Effective Date).

### C. TREATMENT OF CGB'S CLAIM (CLASS 7)

10. The Plan classifies CGB's claim in Class 7, treating it as part of a combined "Zions/CGB secured obligation package" alongside Claim No. 16 (Zions First National Bank—Mortgage, $600,000) and Claim No. 18 (Zions First National Bank, $700,000). The Plan states

these claims are "potentially duplicative or overlapping" and that "no duplicate recovery" is permitted. The Zions claims were filed by the Debtor, and CGB's claim was filed by CGB. They are in fact duplicative to the extent the claims filed by the Debtor were for or on behalf of CGB.

11.    The Plan's proposed treatment of Class 7 provides that: (a) the "LOC component" of CGB's debt is to be "paid or materially paid down" from the Hico Net Sale Proceeds, with an allocation of $700,000 to the LOC component from the initial 100-acre sale, in exchange for "appropriate partial releases of sold acreage"; and (b) the "remaining mortgage/term-loan component" is to be "cured, reinstated, and maintained according to the applicable loan documents," except as modified by agreement, confirmation order, sale order, or further Court order. The Plan states that CGB's lien rights are "retained."

12.    The Plan's Hico Sale waterfall allocates estimated gross proceeds of $1,500,000 as follows: broker/sale costs ($90,000); title/survey/escrow/closing costs ($15,000); ad valorem/tax liens ($43,515.83); payment to the CGB's LOC component ($700,000); and remaining proceeds of $651,484.17 available for a cure/reinstatement reserve for the mortgage/term-loan component (amount "TBD"), IRS reserve (TBD), professional/trustee fees (TBD), and an operating preservation reserve of up to $100,000. The Plan does not propose to allocate all the net proceeds to Note-1 and Note-2 as required, and inappropriately requires CGB to release its lien against the proceeds for no value.

## IV. OBJECTIONS TO CONFIRMATION

**A.    UNCOMPENSATED RELEASE OF THE TERM-LOAN LIEN ON SOLD ACREAGE (11 U.S.C. §§ 1129(B)(2)(A), 363(F))**

13.    Among other things, in a Subchapter V case, the Plan must meet the requirements of Section 1129(a) to be confirmable. *See* 11 U.S.C. § 1191(a). Section 1129(b)(2)(A) of the Bankruptcy Code provides that a plan is "fair and equitable" with respect to a class of secured

claims only if: (i) the holders of such claims retain their liens securing such claims and receive deferred cash payments totaling at least the allowed amount of such claims, with a present value as of the effective date at least equal to the value of the collateral; (ii) the collateral is sold free and clear of liens, with liens attaching to sale proceeds; or (iii) the holders realize the "indubitable equivalent" of their claims. 11 U.S.C. § 1129(b)(2)(A)(i)–(iii).

14.     As established above, both Note-1 and Note-2 are secured by identical collateral— the Hico Property. Any sale of a portion of that collateral necessarily implicates both liens equally.

15.     The Plan's proceeds waterfall, however, allocates only $700,000 from the initial 100-acre proposed sale exclusively to the "LOC component" of the CGB debt, while simultaneously contemplating an "appropriate partial release of the acreage sold" that would necessarily release the term-loan lien on the same sold acreage. This constitutes an uncompensated diminishment of the term-loan lien's collateral base in violation of § 1129(b)(2)(A).

16.     The Supreme Court in *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012), confirmed that § 1129(b)(2)(A) provides an exclusive list of permissible treatments for secured claims in cramdown and that a plan proposing to sell a secured creditor's collateral free and clear must either satisfy § 363(f)'s requirements or provide the secured creditor the indubitable equivalent of its claim. A plan cannot circumvent these protections by allocating sale proceeds to one component of a cross-collateralized debt structure while releasing the lien of another component on the same collateral without compensation.

17.     The treatment afforded to a secured creditor must be completely compensatory, ensuring the realization of the unquestionable value of the creditor's secured interest in its collateral. *Richfield 81 Partners II, LLC v. SunTrust Bank (In re Richfield 81 Partners II, LLC)*, 447 B.R. 653 (2011); *In re Phila. Newspapers, LLC*, 599 F.3d 298 (2010). A plan that extinguishes

a lien on specific collateral without allocating any of the sale proceeds to the extinguished lienholder does not provide the indubitable equivalent of that lienholder's interest.

18. Here, because the 100-acre parcel being sold is subject to both deeds of trust in equal measure, the net sale proceeds must be allocated between both lien components in proportion to their respective secured claims, or CGB must receive equivalent value. The Plan does neither. Instead, it purports to strip the term-loan lien from the sold acreage while directing all sale proceeds (beyond costs and taxes) solely to the LOC component and to the Debtor. This treatment is not "fair and equitable" under § 1129(b)(2)(A) and cannot be confirmed over CGB's objection.

**B. UNDEFINED CRAMDOWN TERMS FOR THE MORTGAGE/TERM-LOAN COMPONENT (11 U.S.C. §§ 1129(B)(2)(A)(I), 1191(B))**

19. Under § 1129(b)(2)(A)(i), a plan may satisfy the "fair and equitable" standard by allowing a secured creditor to retain its lien and providing deferred cash payments with a present value, as of the effective date, equal to the value of the secured claim. In a Subchapter V case, § 1191(b) permits confirmation over the objection of an impaired class if the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such class, incorporating the § 1129(b)(2)(A) requirements.

20. The Plan states that the "remaining mortgage/term-loan component" will be "cured, reinstated, and maintained according to the applicable loan documents," but then immediately qualifies this by providing that such treatment is "except as modified by agreement, confirmation order, sale order, or further Court order." The Plan does not specify: (a) what post-confirmation interest rate will apply to the retained term-loan balance; (b) what payment terms will govern the retained obligation; (c) what amount will constitute the "cure" payment; or (d) what reserve amount (described only as "TBD") will be established for the mortgage/term-loan component from the sale proceeds waterfall.

21. The Plan's failure to define the post-confirmation interest rate, the payment schedule, or even the retained principal balance for the mortgage/term-loan component makes it impossible for this Court—or for CGB—to determine whether the Plan provides present-value treatment satisfying § 1129(b)(2)(A)(i). A plan that leaves the central economic terms of a secured creditor's treatment undefined and subject to future determination cannot be confirmed as "fair and equitable." The Plan's "TBD" designations are not a plan—they are a placeholder for a plan that has yet to be formulated.

**C. FAILURE TO PROVIDE POST-PETITION INTEREST, DEFAULT-RATE INTEREST, AND FEES (11 U.S.C. § 506(B))**

22. Section 506(b) of the Bankruptcy Code provides that "[t]o the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." 11 U.S.C. § 506(b).

23. CGB's claim is oversecured. CGB holds a claim in the approximate amount of $1,780,000 secured by the Hico Property—560 acres scheduled by the Debtor at $10,000,000. Even using conservative valuations, the collateral value exceeds the amount of CGB's secured claim. CGB is therefore entitled under § 506(b) to: (a) post-petition interest at the contract rate; (b) default-rate interest at the contractual Post Maturity Rate; (c) late charges as provided in the Notes; and (d) reasonable attorneys' fees and costs, as expressly provided in both the Notes and the Deeds of Trust.

24. The Supreme Court confirmed in *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235 (1989), that § 506(b) entitles an oversecured creditor to post-petition interest as a matter

of right, and that where the underlying agreement provides for such interest, the agreement's rate controls.

25.     The Plan makes no provision whatsoever for payment of post-petition interest, default-rate interest, late charges, or attorneys' fees and costs to CGB. The Plan's cure/reinstatement language for the mortgage/term-loan component does not address these accruing obligations, and the "TBD" reserve allocations from the sale proceeds waterfall give no assurance that § 506(b) amounts will be funded. This omission renders the Plan non-confirmable under § 1129(a)(1) and precludes "fair and equitable" treatment under § 1129(b)(2)(A).

**D.     ABSENCE OF ADEQUATE PROTECTION DURING THE MARKETING AND SALE PERIOD (11 U.S.C. §§ 361, 363(E))**

26.     Sections 361 and 363(e) of the Bankruptcy Code require that a secured creditor's interest in collateral be adequately protected during the pendency of the case, including during any period in which a debtor uses, sells, or leases property of the estate. Adequate protection may be provided through periodic cash payments, additional or replacement liens, or other relief resulting in the "indubitable equivalent" of the creditor's interest. 11 U.S.C. § 361(1)– (3).

27.     The Plan's sale milestones contemplate a timeline of up to 240 days or more from the Effective Date before sale proceeds are realized. During this extended period: (a) the Debtor will continue to use and occupy the Hico Property; (b) the Debtor's negative monthly operating income of ($945.12) demonstrates an inability to maintain the property at current value; (c) no periodic payments to CGB are provided; (d) no reporting obligations regarding collateral condition or value are imposed; (e) no insurance or maintenance covenants are specified; and (f) no mechanism for monitoring or responding to collateral deterioration is established.

28.     The Deeds of Trust expressly provide for "Lender's Expenditures"—advances made by the lender to protect its security interest in the collateral—and provide that such advances

bear interest at the Note rate and are added to the secured Indebtedness. The Plan makes no provision for CGB to make protective advances or to be reimbursed for any such advances during the marketing period.

29.     The Plan's failure to provide any form of adequate protection during a marketing period that may exceed eight months violates §§ 361 and 363(e) and renders the Plan non-confirmable. CGB's collateral is at risk of diminution in value from market fluctuations, property deterioration, tax delinquency, casualty, or environmental events during this period, with no protective mechanism in place.

### E.     THE PLAN IS NOT FEASIBLE (11 U.S.C. §§ 1129(A)(11), 1190(3))

30.     Section 1129(a)(11) requires that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor." In a Subchapter V case, § 1190(3) additionally requires that the plan include "a brief history of the business operations of the debtor," a "liquidation analysis," and "projections with respect to the ability of the debtor to make payments under the proposed plan of reorganization."

31.     The Fifth Circuit has held that the feasibility requirement under § 1129(a)(11) demands more than a "visionary scheme" or mere speculation about future events; rather, "the plan must offer a reasonable assurance of success" and must be workable. *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997). A plan dependent on uncertain future events that are beyond the debtor's control does not satisfy the feasibility requirement.

32.     The Plan fails the feasibility requirement for the following reasons:

(a) The Plan's entire funding mechanism depends on selling 100 acres of CGB's collateral and retaining a significant portion of the sales proceeds in direct contravention of CGB's lien rights. Moreover, the projected $1,500,000 sales proceeds is the Debtor's own

projection, unsupported by any independent appraisal, broker's price opinion, or comparable sales analysis filed with the Court. No executed purchase contract exists. The Court cannot find feasibility based on the Debtor's unsubstantiated estimate of market value.

(b) The Debtor's Schedule I/J reflects negative monthly net income of ($945.12). The Plan expressly acknowledges that it does not rely on operating income to fund distributions. The Plan is wholly dependent on the use of CGB's collateral proceeds to fund the Plan. There is no alternative funding source. The Debtor cannot service any retained obligations from operations.

(c) If the initial 100-acre sale does not generate sufficient proceeds—because market conditions deteriorate, the property does not appraise, or a buyer cannot be found at $15,000/acre—the Plan provides only for additional acreage to be marketed. This cascading-sale approach merely compounds the speculation rather than resolving it. Each additional sale introduces further delay, additional costs, and further collateral diminution.

## V. PRAYER FOR RELIEF

WHEREFORE, CGB Agrifinancial Services, Inc. respectfully requests that this Court:(a) deny confirmation of the Debtor's Subchapter V Plan of Reorganization [Dkt. 92] as currently proposed, and (c) grant CGB such other and further relief as this Court deems just and appropriate.

## VI. RESERVATION OF RIGHTS

33. CGB expressly reserves all rights, claims, defenses, and objections, whether or not specifically raised herein, including but not limited to: (a) the right to supplement, amend, or modify this Objection at or before the confirmation hearing; (b) the right to object to any amended, modified, or supplemental plan; (c) all rights under the loan documents, including acceleration,

foreclosure, and enforcement rights; (d) the right to seek relief from the automatic stay; (e) the right to object to the allowance or classification of any claim in this case; and (f) the right to assert any additional grounds for denial of confirmation that may become apparent through discovery or further disclosure.

34.     Nothing in this Objection shall constitute a waiver of any right, claim, or defense available to CGB under the Bankruptcy Code, applicable non-bankruptcy law, or the loan documents.

Respectfully submitted,

John Massouh, SBN 24026866
John.massouh@sprouselaw.com
SPROUSE SHRADER SMITH PLLC
701 S. Taylor, Suite 500
P.O. Box 15008
Amarillo, Texas  79105-5008
(806) 468-3300; (806) 373-3454 FAX

*/s/ John Massouh*
John Massouh

**ATTORNEYS FOR CGB
AGRIFINANCIAL SERVICES, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 27, 2026, a true and correct copy of the foregoing Objection of CGB Agrifinancial Services, Inc. to Confirmation of Debtor's Amended Subchapter V Plan of Reorganization was served via the Court's CM/ECF system on all parties registered to receive electronic notification in this case, and by first-class mail on any party not registered for electronic notification, including:

Clayton L. Everett
Norred Law, PLLC
515 E. Border Street
Arlington, Texas 76010
*Counsel for the Debtor*

Katharine Battaia Clark
Thompson Coburn LLP
2100 Ross Av., Suite 3200
Dallas, TX 75201
*Subchapter V Trustee*

*/s/ John Massouh*
John Massouh